IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| KAREN R. BLACKWELL, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security. )<br>) | Case No. 10-0865-CV-S-ODS |

## **ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her applications for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in January 1957, completed eight years of college, has a bachelor's degree in education and an associate's degree in the field of physical therapy, and has prior work experience as a physical therapist and substitute teacher. She alleges she was disabled effective January 1, 2004, due to a constellation of conditions. Plaintiff's primary (although not only) arguments relate to the ALJ's decision not to defer to her treating doctors' opinions and her assessment of Plaintiff's credibility. In the interest of clarity, the Court will focus on the records of the doctors in question.

### A. Dr. Todd Stastny

Dr. Todd Stastny began treating Plaintiff in October 2001 but, by his own admission, "more aggressively since 1/04." The first records from Dr. Stastny are from February 2004, when he saw Plaintiff on a follow-up with respect to concerns about

"significant weight gain" and fatigue. He wrote that Plaintiff appeared "cushingoid" but that "we cannot seem to prove that yet." He noted the MRI was inconsistent with Plaintiff's report of a previous adenoma. Plaintiff was receiving medication to treat hyperprolactinemia, but Dr. Stastny lacked any reports or x-rays to confirm this condition and suggested the treatment might actually be unnecessary and contributing to her problems. Ultimately, nothing significant occurred in light of Plaintiff's upcoming appointment with the Mayo Clinic. R. at 426.

Plaintiff returned to Dr. Stastny in March 2004 and told him the Mayo Clinic confirmed she had "Cushing syndrome, as well as fibromyalgia" and complained of insomnia, weight gain, and fatigue. R. at 415. In reality, the Mayo Clinic concluded Plaintiff did not suffer from Cushing syndrome and only suggested she might have fibromyalgia. R. at 117. A fibromyalgia consultation was recommended, but there is no indication that it ever occurred. Plaintiff was discovered to suffer from hypothyroidism, which was treated. R. at 115-20.[1] In August, Plaintiff told Dr. Stastny (and he agreed) that she could not return to work as a physical therapist. He wrote that Plaintiff brought "old records and documents to help support her problems with her back, right leg, Meniere's disease, previous rib fractures, right knee, and left shoulder areas." Dr. Stastny also expressed his belief that Plaintiff would qualify for Social Security benefits. R. at 413.[2]

On December 28, 2004, Dr. Stastny completed a Multiple Impairment Questionnaire. He indicated Plaintiff suffered from degenerative joint disease at multiple sites (predominately the knees, left shoulder, and back), Meniere's disease, Cushing syndrome, insomnia, hypothyroidism, "fibromyalgia (per Mayo Clinic)" and a

---

[1] Interestingly, Plaintiff told the doctors at the Mayo Clinic that she was biking only half as much as she used to. R. at 116.

[2] Meniere's disease is "an affection characterized clinically by vertigo, nausea, vomiting, tinnitus, and fluctuating and progressive sensory hearing loss associated with" the accumulation of fluid in the ear. Stedman's Medical Dictionary, 28th ed. (2006). While Plaintiff's ear problems (including Meniere's disease) are mentioned by Dr. Stastny, they will be discussed in greater detail when addressing Dr. John Ellis.

2

host of other conditions. He also indicated Plaintiff suffered from a myriad of symptoms, including "chronic pain, weakness, spasm, paresthesias, fatigue, insomnia, [left] vision change, headaches, [and] weight gain." Dr. Stastny opined that Plaintiff was limited in her ability to use her left (non-dominant) shoulder due to "bone fractures, ligament injuries, cartilage injuries and 3-5 surgeries" and could sit for only two hours, stand or walk for only two hours, and needed to get up from sitting every hour. At the conclusion of the questionnaire, Dr. Stastny wrote that he "believe[d], with > 95% confidence, and as much as Mrs. Blackwell has explained to me, the desire to return to her very satisfying profession as a physical therapist, including several trials (even with limits in place), she simply cannot do this again." R. at 154-61.

In February 2005, Dr. Stastny reported Plaintiff completed a sleep study. While Plaintiff did not have sleep apnea, she "had a disrupted sleep pattern" which he believed "may indicate fibromyalgia and other muscular difficulty." He indicated Plaintiff was going to see an orthopedist for a variety of problems and expressed plans to prescribe medication to help Plaintiff sleep. R. at 403. In July 2005 Plaintiff complained of pain in her knee and shoulder, cramping in her leg, and memory loss. Dr. Stastney referred Plaintiff for neuropsychiatric testing and noted she was being treated by an orthopedist. R. at 388. In November, Plaintiff saw Dr. Stastney "mainly for updating" her condition. She reported that she testing and therapy scheduled and requested a handicapped sticker for her car. Dr. Stastney reiterated his suspicion Plaintiff had Cushing syndrome and planned to "look up managements for Cushing and potentially try them, despite the lack of laboratory to support full-blown Cushing." R. at 362.

In May 2006, a document was prepared on Dr. Stastny's stationery. At the end of the typewritten narrative appears the following handwritten statement: "summarized by Charles E. Binder," who apparently represented Plaintiff through part of these proceedings. The signature is Dr. Stastny's. In terms of content, it repeats the information Dr. Stastny provided in the December 2004 Medical Impairment Questionnaire, only in narrative form. R. at 486-87. Dr. Stastny also prepared a

narrative in September 2007. R. at 581, 587.[3] In large measure, this narrative also summarizes the information contained in the December 2004 Medical Impairment Questionnaire. The September 2007 document also indicates Dr. Stastny "found Ms. Blackwell to demonstrate short term memory loss for which she underwent neuropsychiatric testing, which found her to have a low level of attention." Dr. Stastny also noted Plaintiff had "complained of a headache pattern of migraine-like headaches 4 out of 7-10 days." He concluded by opining that Plaintiff's "functional limitations are so extensive as to preclude her from the ability to be substantially gainfully employed since at least January 1, 2004."

### B. Dr. John Ellis

Dr. John Ellis is an ear, nose, and throat specialist who began treating Plaintiff in January 2004. In making her initial appointment, Plaintiff complained of "acute right sided hearing loss associated with roaring tinnitus, whirling vertigo and ear fullness." Before the appointment Plaintiff was told "that this sounded like Meniere's disease" and prescription was called to a pharmacy. During the actual examination, Plaintiff's ears and hearing were normal. Nonetheless, despite the lack of hearing loss or other physical abnormalities associated with the condition, Plaintiff was diagnosed as suffering from Meniere's disease. She was advised to follow a low-sodium diet and continue taking Dyazide (medication for hypothyroidism). R. at 129.

In April, Plaintiff told Dr. Ellis the Mayo Clinic confirmed the diagnosis of Meniere's disease. Even though the Mayo Clinic did not confirm Meniere's disease – and even though Plaintiff only had "milder episodes of lightheadedness and slight fluctuation in hearing [that] always comes back to normal" and was not experiencing roaring tinnitus – Dr. Ellis accepted this representation. Plaintiff was told to maintain her low-sodium diet, return in three months, and call sooner if she experienced "a flare-up of

---

[3]These two pages form the narrative. Somehow, they became separated in the Record.

4

her vertigo or sudden hearing loss." R. at 128. One month later Plaintiff reported "five recent episodes of mild vertigo associated with nausea and sometimes vomiting, tinnitus and fluctuating hearing [and] some clear drainage from the right ear from time to time . . . ." Upon examination, Plaintiff's ear canals and membranes were normal, and she was instructed to cut down on caffeine and MSG. R. at 127. Regular visits in August 2004, February 2005, and June 2005 were similar: Plaintiff reported symptoms consistent with Meniere's disease, Dr. Ellis found no physical indications of Meniere's disease, and Dr. Ellis persisted in his diagnosis. R. at 125, 541, 545.

In September 2005, Dr. Ellis completed a Chronic Vertigo/Meniere's Disease Impairment Questionnaire. In this document Dr. Ellis indicated Plaintiff suffered from Meniere's disease, suffered from tinnitus, vertigo, and balance disturbances but did not have hearing loss and showed none of the other signs of Meniere's disease. The Questionnaire asks the doctor to "explain how the absence of vestibular tests or a negative vestibular test affects the diagnosis and assessment," but this question was left blank. Dr. Ellis concluded Plaintiff would miss three days of work per month. R. at 260-65.

In December 2005, Dr. Ellis completed a narrative statement in which he declared Plaintiff suffered from "fluctuating hearing loss and intermittent vertigo." He also noted that Plaintiff has "normal ear canals and tympanic membranes" and "[a]udiogram showed normal hearing and normal tympanograms were noted." With respect to the diagnosis of Meniere's disease, Dr. Ellis wrote "[t]he patient was evaluated at the Mayo clinic where the diagnosis of Meniere's syndrome was confirmed, according to the patient." R. at 279-A. In May 2006, Dr. Ellis prepared a Revised Narrative Statement Concerning Disability Determination, in which he indicated he diagnosed Plaintiff as suffering from Meniere's disease because she exhibited vertigo, nausea, vomiting, tinnitus and hearing loss and that his diagnosis had been confirmed by the Mayo Clinic. R. at 537-38.

## C. Testimony

The ALJ elicited testimony from two medical experts and a vocational expert. Plaintiff also testified.

### 1. Dr. Richard Katzman

Dr. Katzman is a specialist in internal medicine. He reviewed all of Plaintiff's medical records (including those from the Mayo Clinic) and testified Plaintiff suffered from hypothyroidism that was well-controlled with thyroid replacement. R. at 659-60. He testified that tests performed at the Mayo Clinic did not confirm the presence of Cushing syndrome. R. at 660. His review of the neurologist's records revealed that Plaintiff's migraines were "occurring infrequently" and were under control. R. at 661. With respect to Plaintiff's back pain, Dr. Katzman noted Plaintiff had received an epidural injection from her orthopedist, but there was no evidence of nerve root compression in the CT scans. R. at 661-62. The CT scans demonstrated space narrowing at L5-S1, but no stenosis, fractures, or nerve impairment. R. at 663. Dr. Katzman reviewed the MRIs of Plaintiff's knee and testified they demonstrated degenerative arthritis, but the menisici and ligaments were intact. R. at 669. Finally, with respect to Plaintiff's shoulder, Dr. Katzman testified the MRIs showed mild degenerative changes and some muscle atrophy, but no acute findings. R. at 670-71.

### 2. Dr. Peter DeMarco

Dr. DeMarco is an ear, nose and throat specialist. He reviewed the records from the Mayo Clinic and discovered that none of them indicated Plaintiff suffers from Meniere's disease. In fact, there was no indication doctors at the clinic evaluated her for disorders of the ear, nose or throat. R. at 651-52. Dr. DeMarco also testified that Dr. Ellis' findings did not support a diagnosis of Meniere's disease because the necessary tests had not been performed. R. at 653-54.

6

### 3. Plaintiff's Testimony

Plaintiff was involved in motor vehicle accident in 1997 and suffered a closed-head injury, fractures of her skull, and various other injuries. She returned to work after the accident, but in 2000 she began experiencing increased amounts of pain – presumably due to the injuries suffered in the accident. The pain prevented her from performing duties related to her job in physical therapy. R. at 703-05. When asked why she was unable to work, Plaintiff testified she suffers from insomnia, migraines "sometimes more than twice a month," and is unable to lift objects above shoulder-level. She testified that she can only sit for an hour before needing to change positions due to pain running from her hip to her foot, stand for fifteen to twenty minutes, walk for thirty minutes, lift twenty to twenty-five pounds with her right hand, and lift five pounds with her left hand. R. at 708-11. She testified that she has not been biking since the end of 2004 and she walks on the treadmill at her mother's house four to five days a week. R. at 713-15.

### D. ALJ's Findings

The ALJ discounted the opinions of Dr. Stastny and Dr. Ellis. With respect to Dr. Stastny, the ALJ noted the doctor strongly indicated Plaintiff could not perform the duties of her past work, but this is not the test for disability. He also noted that Dr. Stastny included medical conditions that (1) were treatable, (2) did not exist or (3) for which he was not the primary caregiver. R. at 19. Dr. Ellis' diagnosis also conflicted with the medical evidence, and his own notes indicated Plaintiff's tinnitus was related to her sodium intake: when she controlled her sodium intake, her tinnitus was not a problem. R. at 20. Plaintiff's credibility was affected by, among other things, records reflecting certain medical conditions were controlled, the absence of objective medical evidence supporting Plaintiff's claims, her exercise regimen, her daily activities, the lack of any real evidence that Plaintiff could not perform at a lower exertional level than she had when she was working, and other inconsistencies in the Record. R. at 20. The ALJ

concluded Plaintiff retained the residual functional capacity to stand six hours in a day, sit for four hours in a day, lift twenty pounds occasionally and ten pounds frequently with her right hand, lift five pounds with her left hand, and could not work above shoulder level, around dangerous machinery, or at heights. R. at 21. Based on the vocational expert's testimony, the ALJ found Plaintiff could not return to her past work but retained the ability to work at a variety of jobs, including fitting room attendant, photocopy machine operator, and security systems monitor. R. at 22.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

### A. Treating Physicians

Plaintiff first faults the ALJ for failing to defer to the opinions of Dr. Stastny and Dr. Ellis. Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). Here,

8

there were abundant reasons to disregard these doctors' opinions regarding Plaintiff's residual functional capacity. Dr. Stastny diagnosed Plaintiff as suffering from Cushing syndrome – even though she did not have it. Dr. Ellis diagnosed Plaintiff as suffering from Meniere's disease – even though she did not have it. Plaintiff told the doctors these conditions had been confirmed by the Mayo Clinic, but the Mayo Clinic's records concluded that she did not have Cushing's and did not address Meniere's disease. Plaintiff did not exhibit all of the symptoms of Meniere's disease. The September 2005 questionnaire Dr. Ellis completed asked him to explain how he arrived at the diagnosis without the confirming test results, but he did not answer.[4] Dr. Stastny is not necessarily Plaintiff's treating physician with respect to her back, neck and shoulder because he continually indicated Plaintiff was receiving treatment from an orthopedist. "The treating physician rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians." Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991) (citation omitted). If Plaintiff's orthopedist was treating Plaintiff for a particular condition, then the orthopedist – not Dr. Stastny – is the treating physician with respect to that condition. The doctors also offered opinions without taking into account the ameliorative effects of treatment, particularly with respect to medication for migraines, epidurals for pain, treatment for hypothyroidism, and adherence to a low-sodium diet.

It should be noted that Plaintiff does not suggest the ALJ erred in evaluating the opinions of any doctors other than Dr. Stastny or Dr. Ellis. Plaintiff also does not contend her other doctors have suggested her residual functional capacity is limited to a degree that would preclude her from working. For instance, Dr. Craig Satterlee (an orthopedist) opined that Plaintiff was limited in her ability to lift her arm over her head –

---

[4]Plaintiff's intimation that there is no test for Meniere's disease is not well-taken. In addition to the aforementioned questionnaire, other indications that objective test results are necessary to the diagnosis include Dr. DeMarco's testimony and the Social Security Regulations that describe the impairment.

9

but this was the only restriction he identified.[5] The ALJ's findings are consistent with Dr. Satterlee's opinion.

The ALJ identified legitimate reasons justifying her lack of deference to Dr. Stastny and Dr. Ellis. Moreover, the ALJ's assessment of Plaintiff's functional capacity is consistent with the medical evidence in the Record.

### B. Plaintiff's Credibility

The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> > 1. The claimant's daily activities;
> > 2. the duration, frequency and intensity of the pain

---

[5] Dr. Satterlee also opined that Plaintiff's inability to lift her arms prevented her from working full time, but this is not a medical opinion to which deference would have been owed.

10

> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322. While current regulations incorporate these considerations, the Eighth Circuit has declared that the "preferred practice" is to cite Polaski. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

Plaintiff essentially recounts her testimony and the reasons it should have been believed. She generally describes the ALJ's rationale as "marginal," but the Court disagrees. Plaintiff's statements about Meniere's disease, and Cushing syndrome were unsubstantiated, and her statements about pain were not explained by medical evidence. Plaintiff's statements to her doctors about the Mayo Clinic's findings do not augment her credibility. Plaintiff's activities are inconsistent with the limitations she claimed to suffer.

The Court is not empowered to re-evaluate Plaintiff's credibility. As is often the case, there are reasons to believe her testimony and reasons not to believe it. The ALJ is charged with making this determination, and that decision must be upheld because there is substantial evidence in the Record as a whole to support it.

### C. Hypothetical Questions

Relying on her first two arguments, Plaintiff contends the ALJ's hypothetical questions to the vocational expert were deficient. Inasmuch as the Court rejects Plaintiff's first two arguments, this argument is rejected as well.

## III. CONCLUSION

For these reasons, the Commissioner's final decision is affirmed.

IT IS SO ORDERED.

DATE: May 3, 2011

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT